IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KERI G.,[1]

    Plaintiff,

v.

COMMISSIONER SOCIAL SECURITY ADMINISTRATION,

    Defendant.

Case No. 6:23-cv-00564-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

    Keri G. ("Plaintiff") filed this appeal challenging the Commissioner of Social Security's ("Commissioner") denial of her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles II and XVI of the Social Security Act. The only dispute on appeal is whether the Court should remand for further proceedings or for an award of benefits. (*See* Def.'s Br. & Req. Remand ("Def.'s Br.") at 2, ECF No. 19, agreeing that the Court should reverse and remand but not for an award of benefits). The Court has jurisdiction

---

[1] In the interest of privacy, this opinion uses only the first name and the initial of the last name of the non-governmental party.

PAGE 1 – OPINION AND ORDER

over this appeal pursuant to 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, the Court reverses the ALJ's decision and remands for the immediate calculation and payment of benefits.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "not supported by substantial evidence or based on legal error." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "may not substitute [its] judgment for the [Commissioner's]." *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

///
///
///
///
///

BACKGROUND

I.   PLAINTIFF'S APPLICATIONS

Plaintiff was born in May 1978, making her thirty-four years old on the alleged disability onset date of June 30, 2012.[2] (Tr. 29, 335.) Plaintiff alleges disability due to lupus, degenerative disc disease, bone spurs in her back, fibromyalgia, and migraines.[3] (*Id.* at 377-84.)

The Commissioner denied Plaintiff's applications initially and upon reconsideration, and on August 4, 2021, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 224-26.) Plaintiff and a vocational expert ("VE") appeared and testified at an administrative hearing held on April 21, 2022. (*Id.* at 41-100.) On May 27, 2022, the ALJ issued a written decision denying Plaintiff's applications. (*Id.* at 13-31.) On February 15, 2023, the Appeals Council denied Plaintiff's request for review, making the ALJ's written decision the

---

[2] In her opening brief, Plaintiff states that she is amending her alleged disability onset date to January 1, 2018. (Pl.'s Opening Br. ("Pl.'s Br.") at 5, ECF No. 13.) She cites no authority for amending the alleged onset date on appeal, and the Court agrees with the Commissioner that amending the onset date is an administrative determination. (Def.'s Br. at 5.) In any event, as discussed below, the Court agrees that the record does not support a disability finding prior to January 1, 2018.

[3] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Workers accumulate quarters of coverage based on their earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Here, Plaintiff's date last insured of June 30, 2018 (*see* Tr. 16) reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before June 30, 2018, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15-cv-02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that [s]he was disabled . . . on or before h[er] date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

PAGE 3 – OPINION AND ORDER

final decision of the Commissioner. (*Id.* at 1-6.) Plaintiff now seeks judicial review of the ALJ's decision.

## II.     THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

The claimant bears the burden of proof for the first four steps. *See Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *See id*. at 954. The Commissioner bears the burden of proof at step five, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *See Bustamante*, 262 F.3d at 954.

///

///

PAGE 4 – OPINION AND ORDER

### III.     THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 13-31.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 30, 2012, the alleged onset date. (*Id.* at 16.) At step two, the ALJ found that Plaintiff suffered from the following severe, medically determinable impairments: obesity; a spinal disorder, status-post surgery; disorders of joints including meniscus tears; osteoarthritis in the bilateral knees and a Baker's Cyst; fibromyalgia; migraines; gastroesophageal reflex disease with a hiatal hernia; lupus; a history of carpal tunnel syndrome status-post release surgery; and a history of status-post ulnar surgery at the elbow. (*Id.*)

At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or medically equals a listed impairment. (*Id.* at 19.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform "light work" except she may occasionally push and pull with the bilateral lower extremities and occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.* at 22.) The ALJ also found that she can occasionally balance, stoop, kneel, and crouch, but never crawl, and frequently handle, finger, and feel bilaterally. (*Id.*) Finally, the ALJ found that she can tolerate no exposure to vibrations and hazards, such as dangerous machinery and unprotected heights. (*Id.*)

At step four, the ALJ concluded that Plaintiff is able to perform her past relevant work as an elementary school teacher. (*Id.* at 28.) At step five, the ALJ further determined that Plaintiff was not disabled because a significant number of jobs existed in the national economy that she could perform, including work as a marker, cashier, router, document preparer, surveillance systems monitor, and hospital admitting clerk. (*Id.* at 30.)

///

///

PAGE 5 – OPINION AND ORDER

**DISCUSSION**

In this appeal, Plaintiff argues that the ALJ erred by failing to provide (1) legally sufficient reasons for discounting the opinion of Plaintiff's treating physician, Brittany Alloway, D.O. ("Dr. Alloway"), and (2) clear and convincing reasons for discounting Plaintiff's subjective symptom testimony. (Pl.'s Br. at 6, 17-18.) The Commissioner concedes that the "ALJ did not properly analyze the persuasive value of [Dr. Alloway's] medical opinion using the [applicable] regulatory factors and the ALJ's analysis of Plaintiff's subjective symptoms did not sufficiently discuss evidence regarding possible absenteeism from work due to her symptoms and treatment." (Def.'s Br. at 2.) The Commissioner, however, argues that "the medical opinion contains ambiguities that must be resolved" and "the record does not support Plaintiff's testimony of significant symptoms before treatment or side effects from treatment, and the record is equivocal regarding how frequently she might be absent from work." (*Id.*)

Given the Commissioner's concessions, the only disputed issue on appeal is whether the Court should remand this case for further administrative proceedings or an award of benefits. As explained below, Plaintiff satisfies the credit-as-true standard, and the Court does not have serious doubts about whether Plaintiff is disabled. Accordingly, the Court grants in part the Commissioner's motion to remand and remands this case for an award of benefits.

**I.    REMEDY**

The Court finds that the credit-as-true standard is satisfied here and that remand for the payment of benefits is appropriate.

**A.    Applicable Law**

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted). In

PAGE 6 – OPINION AND ORDER

several cases, however, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits when [the three-part credit-as-true standard is] met." *Garrison v. Colvin*, 759 F.3d 995, 1021 (9th Cir. 2014) (citation omitted).

The credit-as-true standard is met if three conditions are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Id*. at 1020 (citations omitted). Even when the credit-as-true standard is met, the court retains the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.*

### B.     Analysis

The Commissioner concedes that the ALJ committed harmful legal error and that substantial evidence does not support the ALJ's decision. (*See* Def.'s Br. at 2, 4.) The Court agrees. The Court also finds that the fully developed record demonstrates that the erroneously rejected evidence includes limitations that would preclude Plaintiff from sustaining competitive employment and that further administrative proceedings would serve no useful purpose here.

#### 1.     Harmful Error

First, the Commissioner has acknowledged that the ALJ erred by failing to provide legally sufficient reasons, supported by substantial evidence, for discounting Dr. Alloway's opinion and Plaintiff's symptom testimony. (*See* Def.'s Br. at 2, 4.) Thus, the first prong of the credit-as-true standard is satisfied here. See *Michael P. v. Berryhill*, No. 3:18-cv-00902-YY, 2019 WL 3210096, at *2 (D. Or. June 27, 2019) ("[T]he first requisite of the *Garrison* test is

PAGE 7 – OPINION AND ORDER

met, as the Commissioner concedes the ALJ erroneously assessed the medical opinion evidence."), *findings and recommendation adopted*, 2019 WL 3206842 (D. Or. July 16, 2019).

### 2. Fully Developed Record

Second, the Court finds that the record has been fully developed, as it includes over a decade of treatment notes from multiple providers, opinions from several medical sources, and Plaintiff's testimony about the severity and limiting effects of her impairments. *See Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1104 (9th Cir. 2014) (holding that to determine whether the record is fully developed, the court looks to whether there are "significant factual conflicts in the record").

The Commissioner argues that remand for further proceedings is appropriate because the record contains ambiguities regarding the "frequency of Plaintiff's migraines and likely absenteeism," and because evidence in the record conflicts with Plaintiff's testimony regarding her symptoms before and side effects after her infusion treatments. (Def.'s Br. at 6-11.) The Court disagrees.

#### a. Dr. Alloway's Opinion

The Commissioner concedes that in evaluating Dr. Alloway's opinion, the ALJ failed to comply with the applicable regulations by considering the supportability and consistency factors. (Def.'s Br. at 2.) The Commissioner, however, argues that Dr. Alloway's opinion contains ambiguities regarding the frequency of Plaintiff's migraines and likely absenteeism, and therefore the second prong of the credit-as-true test is not satisfied. (*Id.* at 5.)

On December 31, 2020, Dr. Alloway submitted a headache form and opined that Plaintiff would experience migraines less than once per week, but that when she did experience them, they would last six to eight hours. (Tr. 3106.) Dr. Alloway reported that Plaintiff's migraines have aura, produce photophobia, phonophobia, and throbbing/pulsation. (*Id.*) Although

PAGE 8 – OPINION AND ORDER

Dr. Alloway noted that Plaintiff responds well to her medications, including Excedrin migraine, Rizatriptan, and Propranolol, Dr. Alloway reported that Plaintiff's migraines would interfere with her ability to work and that Plaintiff would miss less than one workday per week due to her migraines. (*Id.*)

In his decision, the ALJ explained why he found Dr. Alloway's opinion to be unpersuasive:

> The undersigned is not persuaded by the December 2020 statement from Dr. Brittany Alloway. The doctor did not provide a function-by-function analysis as to how migraines affect [Plaintiff]'s ability to work. Moreover, the [Plaintiff]'s residual functional capacity is supposed to reflect the most the individual can perform, but here we have that [Plaintiff] would miss work less than one day per week, which would include zero days a week.

(*Id.*) (citations omitted). The Court agrees with the Commissioner that the ALJ's evaluation of Dr. Alloway's opinion fails adequately to evaluate the supportability and consistency factors.

With respect to the Commissioner's argument that ambiguities remain regarding how Plaintiff's headaches would impact her absenteeism, Plaintiff responds that Dr. Alloway did not aver that Plaintiff would miss zero days of work per week. (*See* Pl.'s Br. at 18.) The Court agrees.

On November 25, 2020, Dr. Alloway observed that Plaintiff's migraines decreased in frequency from four per week to only one per week with Propranolol, but she also stated that Plaintiff continues to suffer from migraines "once every [two to three] weeks" as of December 31, 2020. (Tr. 1629, 3074, 3070.) Dr. Alloway's assessment of migraines "once every [two to three] weeks" (i.e., less than one migraine per week) explains why Dr. Alloway opined that Plaintiff would experience migraines less than once per week. To be sure, although Dr. Alloway acknowledged that there would be weeks in which Plaintiff does not suffer from any migraines, Dr. Alloway's opinion is clear that even with treatment, Plaintiff will continue to suffer from

PAGE 9 – OPINION AND ORDER

migraines once every two to three weeks and the average duration of Plaintiff's headaches is six to eight hours. Thus, further administrative proceedings to reevaluate Dr. Alloway's opinion on headache frequency are unnecessary.[4]

### b. Benlysta Infusions

The Commissioner does not challenge Plaintiff's argument that the ALJ erred in evaluating her symptom testimony, but argues that further proceedings are necessary because there is "evidence [that] conflicts with Plaintiff's testimony regarding her symptoms before and side effects after her infusion treatments[.]" (Def.'s Br. at 4-5.)

Plaintiff testified that to treat her autoimmune disease (lupus), she must receive Benlysta infusions every twenty-eight days and that the sessions last anywhere from "two and a half to four hours just depending on how everything goes." (Tr. 61.) Plaintiff stated that she experiences exhaustion and nausea after the infusions are complete, and must take nausea medication when she receives the infusions. (*Id.* at 63.) When she receives the infusions every twenty-eight days as directed, her lupus symptoms of "rash, headache, sometimes low-grade fever, arthralgias, and mouth sores" flare up at least one day before the infusion. (*Id.* at 2234.) Plaintiff testified that she and her doctor would prefer that she receive the infusions every twenty-four days, as her symptoms begin to flare up between day twenty-two and twenty-four, but her insurance policy prevents her from doing so. (*Id.* at 73.)

Plaintiff notes that the ALJ failed to discuss her testimony about infusions despite the ALJ's recognized need to "see exactly what her schedule is for the infusions, because if it would interfere with her missing work to go have these infusions[,] that might be a significant issue in

---

[4] Further, if the headache frequency evidence in the record was ambiguous, the ALJ has a duty to "conduct an appropriate inquiry" where evidence is ambiguous or the record is inadequate to allow for proper evaluation of the evidence, and the ALJ conducted no further inquiry here. *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).

PAGE 10 – OPINION AND ORDER

the case[.]" (*Id.* at 103-04.) The Court's review of the ALJ's decision confirms that the ALJ did not mention Plaintiff's scheduled infusions in his decision or analyze how Plaintiff could work full-time despite spending several hours completing the infusion process every four weeks.

At the hearing, the VE testified that to sustain competitive employment, an employee would have to avoid a pattern of absenteeism, namely "[two to three] consecutive missed days or partial days, or [five to six] cumulative over a [twelve]-month period[,]" and the VE testified that "[e]ither one of those would be problematic." (*Id.* at 97.) When Plaintiff's attorney asked the VE about the impact of an employee missing one to two days per month, the VE testified that missing work at this rate would constitute excessive absenteeism. (*Id.* at 98.) If Plaintiff is required to appear for infusion sessions on workdays, the record supports that Plaintiff would miss twelve or thirteen workdays per year due to those sessions, which would exceed employers' customary tolerances.[5] (*See id.* at 97-98, 963, 998, 1700, 2944.)

The Commissioner suggests that Plaintiff would not "necessarily have to miss work to receive" her infusions, noting that "Plaintiff could receive her infusions on scheduled days off or

---

[5] The record further demonstrates that if Plaintiff does not receive infusions on a strict schedule, her symptoms flare before her scheduled infusions and in ways that would result in additional absenteeism. (*See* Tr. 2236, "Her brother was diagnosed with COVID. He was symptomatic. She was exposed to him but tested negative about a week later. Because of that she had to push her BENLYSTA infusion out about two weeks and she began noticing worsening of her symptoms including return of fatigue, fever, mouth sores, and arthralgia. As soon as she gets her BENLYSTA infusion everything goes away"; *id.* at 2250, "There was a glitch with her infusions. She was not able to get them at the Infusion Center so she was off her schedule for an additional three weeks and noticed a recurrence of arthralgias, mouth sores, sun rash, and sickness"; *id.* at 2251, "She has lupus which is flaring off BENLYSTA. Her last infusion was in February because the Infusion Center didn't get a prior authorization and her approval ran out the day before she was scheduled for an [i]nfusion. No one called her and told her. Then there was [q]uite a problem getting the infusion approved due to her [i]nsurance. . . . She is [now] having a flare of rash, joint pain, fever, abdominal pain, nausea, mouth sores, nose sores, and esophageal dysmotility.").

PAGE 11 – OPINION AND ORDER

during scheduled off hours."[6] (Def.'s Br. at 9.) However, even if the record supported that Plaintiff could reliably schedule infusions on her days off from work, neither the ALJ nor the Commissioner point to evidence in the record discrediting Plaintiff's testimony that the infusions cause her to suffer from exhaustion and extreme nausea for up to forty-eight hours. (*See* Tr. 63.)

Further, the record does not support the Commissioner's argument that Plaintiff never reported these side effects to her providers. (*See* Def.'s Br. at 9.) In fact, the record supports Plaintiff's testimony about the disabling nature of her pre- and post-infusion symptoms. (*See, e.g.*, Tr. 383, Plaintiff reported that her Benlysta infusions "can make me tired for [one to four] days after infusion"; *id.* at 1648, "Her lupus medicine makes her nauseated"; *id.* at 2254, "She has responded quite well to BENLYSTA since initiating the medication in October 2018. However, she is having consistent drop-off of benefit five days into her weekly course. She experiences some fatigue, photosensitivity, and increased aches and pains every single week. It is so severe that she has to sequester herself at home every Sunday"; *id.* at 2528, "[Plaintiff] presenting with nausea and abdominal pain. She has mild epigastric tenderness, but her exam is otherwise reassuring. Common known side effects of Benlysta include diarrhea and nausea"; *id.*

---

[6] The Commissioner also notes that Plaintiff has received her infusions at home, and suggests this would allow her to work full-time (Def.'s Br. at 9), but the Commissioner mischaracterizes the record. The record reflects that the only reason Plaintiff was able to utilize an at-home infusion session was due to the COVID-19 pandemic. (*See* Tr. 60.) Plaintiff's rheumatologist, however, directed against this as a clinical practice, even during the pandemic:

> Providence Insurance wanted her to have home infusions and we are uncomfortable with that option as a clinical practice. We would rather she receive an infusion at an Infusion Center with trained infusion nurses. During this COVID-19 pandemic we feel it is safer to send her into a medical facility where proper sanitation and personal protective equipment is available.

(*Id.* at 2251.) Thus, the record fails to support that Plaintiff can utilize at-home infusions at her convenience.

PAGE 12 – OPINION AND ORDER

at 3100, "Her lupus is quiet although she is more sensitive and feels fatigued. She is due for her BENLYSTA infusion this week").

Accordingly, the Court concludes that the record supports Plaintiff's testimony about her infusion schedule and related symptoms, and that further proceedings would serve no useful purpose. *See Garrison*, 759 F.3d at 1021 ("Although the Commissioner argues that further proceedings would serve the 'useful purpose' of allowing the ALJ to revisit medical opinions and testimony that she rejected for legally insufficient reasons, our precedent and the objectives of the credit-as-true rule foreclose the argument that and for the purpose of allowing the ALJ to have a mulligan qualifies as a remand for a 'useful purpose' under the first part of credit-as-true analysis.").

### 3.   Credited as True

Consistent with the discussion above, the Court concludes that if Dr. Alloway's medical opinion is credited as true, the ALJ would be required to find Plaintiff disabled on remand given her absences due to migraines, which last six to eight hours, occur every two to three weeks, and "interfere with the ability to work." (Tr. 3106; *see also id.* at 97-98, the VE testified that missing work either "[two to three] consecutive missed days or partial days, or [five to six] cumulative over a [twelve]-month period" would be "problematic" and missing one to two days per month is excessive absenteeism). Thus, if the "discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled because her impairments would cause her to exceed the customary tolerance for absences." *Christine L. v. Saul*, 450 F. Supp. 3d 1091, 1107-08 (D. Or. 2020).

Separately, if Plaintiff's improperly discredited symptom testimony was credited as true, the ALJ would be required to find Plaintiff disabled on remand because her lupus treatment

PAGE 13 – OPINION AND ORDER

schedule and symptoms would cause excessive absenteeism incompatible with sustaining gainful employment. *See id.* For these reasons, the Court concludes that Plaintiff satisfies the "three-part credit-as-true standard[.]" *Garrison*, 759 F.3d at 1020.

### 4. No Serious Doubt

Finally, the Court concludes that the record as a whole does not create serious doubt as to whether Plaintiff is disabled within the meaning of the Social Security Act. *See, e.g.*, *Fraga-Jimenez v. Saul*, No. 1:18-cv-00430-CWD, 2020 WL 1249877, at *11-12 (D. Idaho Mar. 16, 2020) (reversing and remanding for the immediate award of benefits where the improperly discounted evidence were credited as true, as it was apparent that the plaintiff could not maintain a full-time job due to her lupus and chronic migraines). Accordingly, the Court remands this case for the immediate calculation and payment of benefits.[7]

### CONCLUSION

For the reasons stated, the Court GRANTS IN PART the Commissioner's motion to remand (ECF No. 19), REVERSES the Commissioner's decision, and REMANDS for the immediate calculation and payment of benefits as of January 1, 2018.

**IT IS SO ORDERED.**

DATED this 16th day of December, 2024.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[7] The Court agrees with Plaintiff that the record does not support a finding of disability before January 1, 2018, as the medical records reflect that her impairments worsened on or about that date. (*See* Pl.'s Br. at 5.) Accordingly, the Court finds that the period of disability should begin on January 1, 2018. *See Richard W. v. Comm'r Soc. Sec. Admin.*, No. 6:21-cv-00969-JR, 2022 WL 1403997, at *4-5 (D. Or. May 4, 2022) (finding that "while [the] plaintiff alleges disability as of December 2013, there is nothing in the record establishing the presence of concrete functional limitations prohibiting competitive employment on or around that date[,]" and therefore remanding "for the immediate payment of benefits as of November 24, 2015").

PAGE 14 – OPINION AND ORDER